# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STI PHARMA, LLC,<br>32 Blacksmith Road<br>Newtown, PA 18940<br><br>    Plaintiff,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as<br>Secretary of the U.S. Department of Health and<br>Human Services,<br>Office of the Secretary<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>U.S. DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES,<br>200 Independence Avenue, SW<br>Washington, DC 20201<br><br>SEEMA VERMA, in her official capacity as<br>Administrator of the Centers for Medicare and<br>Medicaid Services,<br>Office of the Administrator<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>and<br><br>CENTERS FOR MEDICARE AND MEDICAID<br>SERVICES,<br>7500 Security Boulevard<br>Baltimore, MD 21244<br><br>    Defendants. | CIVIL ACTION No. 18-1231 |

# COMPLAINT FOR DECLARATORY, MANDAMUS, AND INJUNCTIVE RELIEF

## INTRODUCTION

Under the federal-state Medicaid health insurance program administered by the Centers for Medicare and Medicaid Services ("CMS"), participating drug manufacturers pay quarterly rebates to each state Medicaid agency based on the quantity of outpatient prescriptions of their drugs for which each such state Medicaid program has paid in a given quarter. The Medicaid rebate statute provides for a higher per-drug rebate in the case of "innovator" drugs than for "noninnovator" (i.e., "generic") drugs. Plaintiff STI Pharma, LLC, a drug manufacturer, participates in Medicaid. From the fourth calendar quarter of 2013 ("4Q2013") through the first calendar quarter of 2016 ("1Q2016"), Plaintiff's prescription drug Sulfatrim Pediatric Suspension ("Sulfatrim") was erroneously designated as an "innovator" rather than a "noninnovator" in CMS records. This resulted in rebate claims from the states that were substantially higher than they should have been if Sulfatrim had been correctly classified as a "noninnovator" product. The "noninnovator" status of Sulfatrim was confirmed by CMS effective April 1, 2016, based on CMS regulations that became effective on that date. This "noninnovator" status applies equally to the quarters prior to April 1, 2016, in that the underlying statutory definitions of these drug categories have not changed. Despite Plaintiff's repeated requests that CMS correct Sulfatrim's status in CMS records for the period 4Q2013 to 1Q2016 so that Plaintiff's rebate liability to the states can be reconciled, CMS has refused to do so. The purpose of this action is to require CMS to make the requested correction in accordance with law.

## JURISDICTION AND VENUE

1. Plaintiff's causes of action arise under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 *et seq.*, and the Medicaid Drug Rebate

Program, Section 1927 of the Social Security Act, 42 U.S.C. § 1396r-8.

2. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201 and 2202 (declaratory relief), and 28 U.S.C. § 1361 (mandamus). There exists between the parties an actual controversy, justiciable in nature, wherein Plaintiff seeks a declaration of its rights by this Court as well as injunctive relief and relief in the nature of mandamus.

3. The relief requested is authorized pursuant to 28 U.S.C. § 1651, 28 U.S.C. § 2201, and 28 U.S.C. § 2202.  Plaintiff has a right to bring this action pursuant to 5 U.S.C. §§ 701-706.

4. Venue is proper under 28 U.S.C. § 1391(e).

**PARTIES**

5. Plaintiff is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 32 Blacksmith Road, Newtown, PA. Plaintiff is a small pharmaceutical company engaged in the development of niche pharmaceutical products intended primarily for specialty markets.  Plaintiff holds New Drug Application ("NDA") number 18-615, a pre-1984 "paper" NDA approved by the United States Food and Drug Administration ("FDA") on January 7, 1983, for Sulfatrim, which bears NDC ("National Drug Code") 54879-0007-16.  Sulfatrim is a prescription drug containing sulfamethoxazole and trimethoprim in an oral suspension dosage form.  Plaintiff acquired the rights to Sulfatrim from its previous owner on July 12, 2011. Plaintiff currently markets Sulfatrim, which is covered by Plaintiff's National Drug Rebate Agreement with CMS under the Medicaid Drug Rebate Program.

6. Defendant CMS is an agency of the United States Government within the Department of Health and Human Services ("HHS").

7. Defendant HHS is an agency of the United States Government.

8. Defendant Alex M. Azar II is named in his official capacity as Secretary of HHS, in whom is vested the authority by statute to implement the requirements of the Social Security Act, including the Medicaid Drug Rebate Program.

9. Defendant Seema Verma is named in her official capacity as Administrator of CMS, to whom HHS has delegated authority to implement certain requirements of the Social Security Act, including the Medicaid Drug Rebate Program.

## BACKGROUND

### A. The Medicaid Drug Rebate Program

10. Medicaid is a joint federal-state government health insurance program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396-1 *et seq.* Medicaid programs are created and administered by the individual states under federal requirements and criteria enforced by CMS. State Medicaid programs are supported in part by federal funding. Although drug coverage is an optional benefit under the federal Medicaid law, all states currently provide coverage for outpatient prescription drugs to all categorically eligible individuals and most other enrollees in their state Medicaid programs.

11. In order for a covered outpatient drug to be reimbursed under the federal-state Medicaid program, the drug manufacturer must enter into a rebate agreement with the Secretary of HHS and submit product and pricing data for the drug to CMS as part of its administration of the Medicaid Drug Rebate Program. 42 U.S.C. § 1396r-8.

12. Under the Medicaid Drug Rebate Program, covered outpatient drugs fall into one of three categories defined in the statute: single source ("S" drug category); innovator multiple source ("I" drug category); or noninnovator multiple source ("N" drug category). The rebates paid by manufacturers are based on statutory formulas that depend on the drug category. The rebates

for most "S" and "I" drugs currently are the greater of 23.1% of the Average Manufacturer Price ("AMP") per unit or the difference between AMP and the "best price" per unit, plus a price increase adjustment. The rebates for "N" drugs are much lower; currently, they are 13% of AMP per unit, plus (as of 2017) a price increase adjustment. The rebate calculated under these formulas per unit of drug (e.g., per milliliter in this case) is known as the Unit Rebate Amount. Rebate liability is determined by calendar quarter and billed to the manufacturer by state Medicaid programs on a quarterly basis.

13. Under the Medicaid rebate statute, the term "innovator multiple source drug" ("I" drug) is defined, in pertinent part, as "a multiple source drug that was originally marketed under an original new drug application approved by the Food and Drug Administration." 42 U.S.C. § 1396r-8(k)(7)(A)(ii).

14. Under the Medicaid rebate statute, the term "noninnovator multiple source drug" ("N" drug) is defined as "a multiple source drug that is not an innovator multiple source drug." 42 U.S.C. § 1396r-8(k)(7)(A)(iii).

15. CMS regulations implementing the statute that were in effect from October 1, 2007, through March 31, 2016, define "innovator multiple source drug," in pertinent part, as "a multiple source drug that was originally marketed under an original new drug application (NDA) approved by the Food and Drug Administration (FDA)." Medicaid Program Prescription Drugs, 72 Fed. Reg. 39,142, 39,240 (July 17, 2007) (codified at 42 C.F.R. § 447.502). These regulations did not further define the term "original NDA." The regulations defined "noninnovator multiple source drug," in pertinent part, as "(1) a multiple source drug that is not an innovator multiple source drug or a single source drug [or] (2) a multiple source drug that is marketed under an abbreviated NDA or an abbreviated antibiotic drug application." *Id.*

16. CMS regulations in effect from April 1, 2016, to the present define "innovator

multiple source drug," in pertinent part, as "a multiple source drug that was originally marketed under an original new drug application (NDA) approved by FDA." Medicaid Program Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5348 (Feb. 1, 2016) (codified at 42 C.F.R. § 447.502) ("2016 Final Rule"). These regulations further state, "For purposes of this definition and the Medicaid drug rebates (MDR) program, an original NDA means an NDA, other than an Abbreviated New Drug Application (ANDA), approved by the FDA for marketing, unless CMS determines that a narrow exception applies." *Id.* The regulations define "noninnovator multiple source drug," in pertinent part, as "(1) A multiple source drug that is not an innovator multiple source drug or a single source drug [or] (2) A multiple source drug that is marketed under an ANDA or an abbreviated antibiotic drug application." *Id.* at 5349 (codified at 42 C.F.R. § 447.502).

      **B.**      **FDA's Approval of Sulfatrim**

      17.      Sulfatrim is a prescription drug containing sulfamethoxazole and trimethoprim in an oral suspension dosage form. Plaintiff acquired the rights to Sulfatrim from its previous owner on July 12, 2011. Sulfatrim is currently marketed by Plaintiff and is covered by Plaintiff's Medicaid rebate agreement.

      18.      Sulfatrim is marketed under NDA 18-615, a pre-1984 "paper" NDA approved by FDA on January 7, 1983. Discussed in greater detail below, a pre-1984 "paper" NDA is a type of NDA submitted to FDA for approval of generic copies, or duplicates, of innovator drug products. *See* Medicaid Program Covered Outpatient Drugs, 81 Fed. Reg. at 5191-92. Pre-1984 paper NDAs predate the enactment of the 1984 Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act ("FFDCA"), which established the streamlined ANDA process for obtaining FDA approval of generic drugs, which manufacturers now use in lieu of paper NDAs to gain approval of duplicates of innovator drug products.

19. NDA 18-615 for Sulfatrim was originally submitted to FDA by National Pharmaceutical Manufacturing Company ("National Pharmaceutical") on March 19, 1981. The NDA was a "paper" NDA for a generic version of Bactrim (sulfamethozazole and trimethoprim) Suspension, the innovator brand name product, which had been approved by FDA in 1975 under NDA 17-560. FDA approved the "paper" NDA for National Pharmaceutical's generic version of Bactrim Suspension (named Sulfatrim) on January 7, 1983. Ownership of Sulfatrim and NDA 18-615 was subsequently transferred several times, and Plaintiff has owned the rights to the NDA and the product since July 12, 2011.

20. In the preamble to the 2016 Final Rule, CMS stated, ". . . [O]ur understanding is that an innovator multiple source drug is a drug that was initially marketed under an NDA, other than an ANDA, approved by FDA but is rated therapeutically equivalent to at least one other product in the FDA's 'Approved Drug Products with Therapeutic Equivalence Evaluations' (Orange Book) that is sold or marketed in the United States during the rebate period." Medicaid Program Covered Outpatient Drugs, 81 Fed. Reg. at 5191. However, CMS recognized that there are certain exceptions to this general rule: "[C]ertain drugs approved under a paper NDA prior to the enactment of the Hatch-Waxman Amendments of 1984 or under certain types of literature-based 505(b)(2) NDA approvals after the Hatch-Waxman Amendments of 1984 might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug, depending on the unique facts and circumstances of the particular situation." *Id.* As CMS noted, "[t]he reference to paper NDAs refers to applications that were also approved under section 505(b), but as noted in response to other comments, the FDA's paper NDA policy incorporated two types of approvals – one for duplicates of approved NDAs (now approved under section 505(j)), and one for other than those for duplicate products (now approved under section

505(b)(2))."[1] *Id.* at 5192.

21. As acknowledged by CMS in the preamble to the 2016 Final Rule, duplicate generic versions of innovator drugs were approved by FDA under the "paper" NDA process prior to the Hatch-Waxman Amendments of 1984, which created distinct statutory pathways for approval of generic drugs. These "paper" NDAs were analogous to the section 505(j) ANDAs for generic drugs subsequently established by the 1984 amendments. NDA 18-615 for Sulfatrim was expressly described by the applicant as seeking approval for a generic version of the innovator product. FDA expressly described the application as "a duplicate NDA for a post 1962 drug." Consistent with its status as a pre-1984 "paper" NDA, the applicant submitted published literature (i.e., "paper"), rather than new clinical studies, in support of the safety and effectiveness of the product.

22. Sulfatrim was a "duplicate" (i.e., "generic") version of the innovator reference drug Bactrim Suspension in that (a) it contained the same active ingredients at the same strengths (sulfamethoxazole 200 mg/5 ml, trimethoprim 40 mg/5 ml); (b) it had the same dosage form (suspension); (c) it had the same route of administration (oral); and (d) it had the same conditions of use as the reference drug (same indications or a subset thereof). In reviewing and approving NDA 18-615, FDA required only bioavailability studies, which were conducted for the applicant using the Bactrim product as the reference drug. Thus, the pre-1984 "paper" NDA for Sulfatrim was directly analogous to an ANDA for generic drugs established by the 1984 Hatch-Waxman Amendments and would have been submitted and approved under section 505(j) after the 1984 amendments.

---

[1] Sections 505(j) and 505(b)(2) refer to sections of the FFDCA, which are codified at 21 U.S.C. § 355(j) and § 355(b)(2).

23. As a pre-1984 generic drug, Sulfatrim did not receive any patent-related or marketing exclusivity under the FFDCA.

24. Based on this history, NDA 18-615 for Sulfatrim is not an "original NDA" for purposes of the Medicaid Drug Rebate Program. Sulfatrim is a multiple source drug, and because NDA 18-615 is not an "original NDA," Sulfatrim is not an innovator multiple source ("I") drug. *See* 42 C.F.R. § 447.502 (2015) (defining innovator multiple source drug as having been originally marketed under an original NDA). Because Sulfatrim is not an "I" drug, and also because NDA 18-615 is analogous to an ANDA, Sulfatrim is a noninnovator multiple source ("N") drug. *See id.*

**C. Sulfatrim's Drug Category under the Medicaid Drug Rebate Program**

25. Plaintiff acquired Sulfatrim and NDA 18-615 from Actavis Mid Atlantic, LLC ("Actavis"), the immediately previous owner, on July 12, 2011. Consistent with the history and nature of NDA 18-615, Actavis had previously listed Sulfatrim with the Medicaid Drug Rebate Program as an "N" drug.

26. New owners of covered outpatient drugs are required to list the product with the Medicaid Drug Rebate Program under their own name and NDC number. Based on its misunderstanding of the application of the statute and regulations to pre-1984 "paper" NDAs, Plaintiff mistakenly listed Sulfatrim with the Medicaid Drug Rebate Program in 2012 under its own name and NDC number as an "I" drug (innovator multiple source drug) following the company's acquisition of the product and its NDA.

27. Sulfatrim has been marketed by Plaintiff from 4Q2013 to the present.

28. Plaintiff became aware of the incorrectness of Sulfatrim's "I" drug listing in conjunction with the issuance of the 2016 Final Rule by CMS. In the preamble to the 2016 Final Rule, CMS indicated that a manufacturer who believes its drug falls within the so-called "narrow

exception" for drugs approved under certain NDAs, such as a pre-1984 "paper" NDA, should submit documentation to CMS demonstrating that its drug should be classified as a noninnovator multiple source ("N") drug. Medicaid Program Covered Outpatient Drugs, 81 Fed. Reg. at 5192. Plaintiff made this submission to CMS on February 18, 2016.

29. By letter dated August 3, 2016, CMS confirmed that Sulfatrim qualifies for the so-called "narrow exception" and approved Plaintiff's request to report it to the Medicaid Drug Rebate Program as an "N" drug. The letter stated that the effective date of the change to "N" drug status would be April 1, 2016, the effective date of the 2016 Final Rule. Accordingly, Sulfatrim has been listed as an "N" drug in the CMS Medicaid Drug Rebate Program database from the second quarter of 2016 ("2Q2016") to the present.

### D. CMS's Refusal to Correct the Prior Reported Drug Category for Sulfatrim

30. CMS procedure requires manufacturers who wish to correct prior information submitted to the Medicaid Drug Rebate Program to request correction of such records by CMS, i.e., CMS procedures do not allow a manufacturer unilaterally to correct CMS records, such as a drug's category for prior reporting periods.

31. On October 27, 2016, Plaintiff submitted a request to CMS to correct Sulfatrim's prior reported drug category from "I" to "N" for the quarters 4Q2013 to 1Q2016. (As noted above, Sulfatrim was already listed as an "N" drug for 2Q2016 and onward.) The request was based on the fact that NDA 18-615 was not an "original NDA" for purposes of the Medicaid Drug Rebate Program, which had been essentially confirmed by CMS's action on the "narrow exception" request. Plaintiff's submission noted that, while the "narrow exception" procedure was expressly created by the 2016 Final Rule, the finding that "N" drug status was appropriate – and thus that NDA 18-615 would not be considered an "original NDA" – also supports the status of NDA 18-615 under the "original NDA" language that appears in the statute and in the CMS regulations

applicable to the 4Q2013 to 1Q2016 period.

32. Significantly, the preamble to the 2016 Final Rule includes the following discussion:

> Comment: [CMS] received several comments regarding CMS's use of the word "clarification" in our discussion of the proposed definition of innovator multiple source drug. The commenters stated that rather than clarification, the proposed definition is instead a reversal of previous policy, or a major change to standard industry practice, which could potentially have the effect of imposing retrospective liability for manufacturers.
>
> Response: [CMS] disagree[s] with the commenters that our interpretation of the definition of single source and innovator multiple source drug could be perceived as a change or reversal of policy. Our proposed language was not designed to change CMS policy, but rather to provide further clarification that an "original NDA" means an NDA, other than an ANDA, approved by the FDA for marketing, unless the narrow exception discussed above applies.

Medicaid Program Covered Outpatient Drugs, 81 Fed. Reg. at 5195-96. The preamble further states, "The definitions of single source drug, innovator multiple source drug, and noninnovator multiple source drug that we are finalizing in this final rule are clarifications of existing statutory language, and we encourage manufacturers who may have incorrectly classified their drugs in the past to take appropriate action now. . . . If a manufacturer determines a drug category change is needed, the manufacturer is responsible for contacting CMS to request that change." *Id.* at 5198.

33. Despite repeated requests for status reports on the matter, CMS did not respond to Plaintiff's request until August 23, 2017. CMS denied the request to correct Sulfatrim's drug category on the grounds that the 2016 Final Rule was effective April 1, 2016, and that changes made as "a result of granted narrow exception requests cannot be effective prior to the effective date of that Final Rule." Email from CMS Rx Drug Policy dated August 23, 2017. The CMS response alleged that, for periods prior to the 2016 Final Rule effective date, Sulfatrim met the definition of an "I" drug because it "was approved and marketed under a new drug application (NDA) and was a multiple source drug." *Id.* The CMS response misunderstood the fact that

Plaintiff was not seeking to apply the "narrow exception" process retroactively for any period prior to the 2016 Final Rule's effective date. More significantly, in asserting that Sulfatrim qualified as an "I" drug prior to the 2016 Final Rule's effective date, the CMS response ignored the key qualifier "original" in the term "original NDA" included in the statute and in the regulatory definition of an "I" drug applicable to the 4Q2013 to 1Q2016 period, as well as its own admission that the 2016 Final Rule did not change existing policy or law.

34. On September 8, 2017, Plaintiff submitted a request for reconsideration to CMS together with a detailed legal analysis responding to the deficiencies in CMS's August 23, 2017, response.

35. Again, despite repeated requests, CMS did not respond to the request for reconsideration until CMS finally, by email dated December 14, 2017, offered to have a face-to-face meeting.

36. The face-to-face meeting was held on January 16, 2018. Attendees included John Coster, PhD, RPh, who heads the CMS Division of Pharmacy, which is responsible for Medicaid Drug Rebate Program policy. After listening to Plaintiff's brief summary of its legal analysis, Dr. Coster stated that CMS stood by its prior position, essentially without any further explanation or attempt to address Plaintiff's legal arguments or conclusions.

37. Following the face-to-face meeting, Plaintiff wrote to CMS on January 19, 2018, noting Plaintiff's understanding that it is ultimately the responsibility of the manufacturer to calculate and pay the appropriate Medicaid rebate under the statute. Plaintiff indicated that it accordingly intended to recalculate its rebate liability to the states based on Sulfatrim's status as an "N" drug for the 4Q2013 to 1Q2016 period and to inform the individual state Medicaid agencies of the need to reconcile its rebate liability account with each state accordingly.

38. By letter dated February 21, 2018, CMS responded by stating that it "continues to disagree with [Plaintiff's] interpretation that Sulfatrim should be treated as an 'N' drug prior to the effective date of the Final Rule." In response to Plaintiff's proposal to contact states on its own responsibility, CMS further stated that it "intend[s] to tell the states that we are opposed to this unilateral action taken by [Plaintiff]."

39. To date, Plaintiff has not contacted the states regarding the recalculation of its Medicaid rebate liability.

40. The preamble to the 2016 Final Rule states that manufacturers of <u>drugs marketed under an NDA and reported currently to the Medicaid Drug Rebate Program as noninnovator multiple source drugs</u> would have up to four quarters after the effective date of the Final Rule to apply for an exception. Medicaid Program Covered Outpatient Drugs, 81 Fed. Reg. at 5192. Per the preamble, CMS would review the materials submitted with the exception request and confirm in writing whether the exception does or does not apply. *Id.* Significantly, "[t]o the extent a manufacturer has <u>previously reported a drug marketed under an NDA, other than an ANDA, as a noninnovator multiple source drug</u>, or believes it has approval from CMS to do so, the manufacturer must submit materials and receive a written determination from CMS as described above pursuant to this final rule." *Id.* (emphasis added). Thus, CMS appears to treat other similarly situated drug manufacturers with drugs approved under pre-1984 "paper" NDAs who had reported their products as "N" drugs during the 4Q2013 to 1Q2016 period differently than Plaintiff by not requiring such manufacturers to correct their drugs' category to "I" drug for such past period or requiring such manufacturers to pay rebates for "I" drugs for such past period. Plaintiff merely seeks to be put in the same position as such similarly situated drug manufacturers. This disparate treatment of such manufacturers and Plaintiff is arbitrary, capricious, and otherwise

not in accordance with law.

41. Plaintiff has clearly exhausted its administrative remedies with CMS.

42. CMS's refusal to correct Sulfatrim's drug category and the resulting impact on Plaintiff's rebate liability for the quarters in question represents a severe economic hardship to Plaintiff.

**CLAIM I**
**(Violation of the Administrative Procedure Act: CMS's Refusal to Correct Sulfatrim's Drug Classification for the Quarters 4Q2013 to 1Q2016 Was Arbitrary, Capricious, and Not in Accordance with the Social Security Act and Exceeded the Agency's Statutory Authority)**

43. Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

44. CMS's refusal to correct Sulfatrim's drug classification for the quarters 4Q2013 to 1Q2016 is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

45. The APA proscribes agency action that is in excess of statutory authority and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

46. As Sulfatrim properly qualified as an "N" drug from the outset of the Medicaid Drug Rebate Program, CMS's refusal to correct Sulfatrim's drug classification for the quarters 4Q2013 to 1Q2016 is in excess of statutory authority and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

## CLAIM II
**(Violation of the Administrative Procedure Act: CMS's Refusal to Correct Sulfatrim's Drug Classification for the Quarters 4Q2013 to 1Q2016 Was Arbitrary, Capricious, and Not in Accordance with the Social Security Act, and the Agency's Action Is Unsupported by, and Lacks a Rational Connection to, the Evidence in the Administrative Record)**

47. Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

48. CMS's refusal to correct Sulfatrim's drug classification for the quarters 4Q2013 to 1Q2016 is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

49. Under the APA, an agency action is arbitrary and capricious when the agency acts counter to the evidence in the record or when its action lacks a rational connection to the facts of the record. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983); *Haselwander v. McHugh*, 774 F.3d 990, 998-999 (D.C. Cir. 2014).

50. The administrative record lacks evidence supporting a conclusion that, for the quarters 4Q2013 to 1Q2016, NDA 18-615 qualified as an "original NDA" and that Sulfatrim qualified as an "I" drug.

51. In failing to reflect Sulfatrim's status as a duplicate of an innovator drug (i.e., an "N" drug), and NDA 18-615's status as a "paper" NDA not qualifying as an "original NDA" under applicable law, CMS took final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare CMS's refusal to correct Sulfatrim's drug classification for the quarters 4Q2013 to 1Q2016 to "N" drug status as arbitrary, capricious, and not in accordance with the Social Security Act or otherwise in excess of the Agency's authority;

B. Declare that Sulfatrim qualified as an "N" drug for purposes of the Medicaid Drug Rebate Program for the quarters 4Q2013 to 1Q2016;

C. Vacate and set aside CMS's refusal to correct Sulfatrim's drug classification for the quarters 4Q2013 to 1Q2016 to "N" drug status;

D. Remand the matter to CMS to correct Sulfatrim's drug classification for the quarters 4Q2013 to 1Q2016 to "N" drug status;

E. Enjoin CMS from taking further action to classify or otherwise treat Sulfatrim as an "I" drug for the quarters 4Q2013 to 1Q2016;

F. By writ of mandamus or injunction, order CMS to take prompt action to correct its records to reflect Sulfatrim's "N" drug status for the quarters 4Q2013 to 1Q2016 and to inform state Medicaid agencies of this action;

G. Award Plaintiff attorneys' fees and reasonable expenses incurred in connection with this action; and

H. Grant such other relief as this Court deems just and proper.

Respectfully submitted,

**/s/ Kinsey S. Reagan**
Kinsey S. Reagan (D.C. Bar No. 284125)
James W. Woodlee (D.C. Bar No. 996877)
KLEINFELD, KAPLAN & BECKER, LLP
1850 M Street, N.W. – Suite 800 Washington, D.C. 20036-6606202-223-5120
kreagan@kkblaw.com
jwoodlee@kkblaw.com
*Attorneys for Plaintiff STI Pharma, LLC*

Dated: May 25, 2018